835 So.2d 206 (2002)
J.W.
v.
D.W. and D.W. In the matter of S.D.W., a minor.
2000221.
Court of Civil Appeals of Alabama.
May 10, 2002.
*207 Wendy Brooks Crew of Wendy Brooks Crew & Associates, Birmingham, for appellant.
Corey B. Moore of Weathington & Moore, P.C., Moody, for appellees.
MURDOCK, Judge.
This matter was initiated on June 30, 2000, when B.K.W., the natural father, filed a petition seeking custody of his three-year-old daughter, S.D.W. In his petition, the father alleged that J.W., the natural mother and custodian of the child, had been neglectful in caring for the child, and that placing the child in his custody would serve the best interests of the child. Several days after he filed his petition, the mother filed a separate action seeking to establish paternity and seeking child support. The juvenile court set the father's petition for a hearing on July 24, 2000, and appointed a guardian ad litem to represent the interests of the child in that action. The juvenile court continued the hearing on July 20, 2000, due to the maternal grandmother's hospitalization. The hearing was continued a second time to September 25, 2000, on the mother's motion so as to accommodate her plans concerning her impending marriage to a man domiciled in Illinois. The mother also moved to consolidate the pending custody action with the petition seeking to establish paternity and seeking child support. The juvenile court granted that motion. On September 21, 2000, the paternal grandparents, Do.W. and De.W., moved to intervene in the action to seek pendente lite custody and permanent custody of the minor child. On that same date, the parties filed a joint motion seeking a continuance of the hearing.
The hearing in this matter took place on October 3, 2000. Immediately before the hearing, the juvenile court granted the grandparents' petition to intervene. In his opening remarks, the father's attorney informed the court that the father was undergoing inpatient treatment for drug dependency and that he was about four weeks away from completing the program. The attorney informed the court that because of that circumstance, the father was willing to stipulate that the paternal grandparents were a better choice to be the child's custodians than he would be. The father made it clear, however, that he was not withdrawing his petition for custody as against the mother.
The hearing proceeded, and the paternal grandmother and four "peer"[1] witnesses, *208 who described themselves as acquaintances of the mother, testified that the mother had been neglectful of the child's needs. The paternal grandmother testified that the mother had resided in her home with the father for several months during the couple's trial "engagement." She described the mother as obsessed with communicating on the Internet to the point that she had completely ignored the child's cries and had left the child in wet diapers. The paternal grandmother further testified that the mother had delayed seeking necessary dental treatment for the child and that the mother would commonly postpone picking up prescriptions for the child's ear infections. The paternal grandmother testified that the mother had moved out of her home after a physical altercation between the two of them over the issue of baby-sitting for the child.
The four peer witnesses testified that they had "hung out" and "partied" with the mother and that they had witnessed the mother bring the child to parties and poker games, at which the mother had drunk alcohol to excess. One of the witnesses testified that he had seen the mother smoking pot. These witnesses provided additional testimony that the mother had ignored the child's needs while in their presence, and that the mother had permitted the child to cry continuously without attention unless someone volunteered to assist the child. Two of the witnesses testified that they had escorted the mother to her house, which she and the minor child shared with the maternal grandmother, on occasions when she had consumed so much alcohol that she was incapable of walking the short distance to her house while carrying her child. These witnesses testified that on such occasions they would either remain at the mother's house for the night or they would put the child in her crib while the mother went to sleep in her bed in her inebriated condition. These two witnesses testified that the mother's home was unkempt and that the kitchen was filthy, with cockroaches crawling on the floor. In addition to the four witnesses who testified against the mother, the paternal grandparents' attorney proffered three additional witnesses who had also socialized with the mother and who would give similar testimony; however, the parties entered into a stipulation that the testimony of those additional witnesses would be substantially similar to the other "peer" witnesses and that they therefore did not need to give testimony in the cause.
The paternal grandmother testified that the child had developed rampant decay in six of her front teeth as a result of being put to bed with a bottle. She further testified that one of those teeth had had to be extracted due to extensive decay. The paternal grandmother stated that the mother had pointed out a brown spot on one of the child's front teeth to the paternal grandmother in October 1999. The paternal grandmother testified that she had agreed with the mother at that time that the child needed to be seen by a dentist and that she had offered at that time to pay a portion of the child's dental bill. She testified that she reminded the mother several times that she needed to make a dental appointment for the child, but that the mother had failed to make the necessary arrangements.
The paternal grandmother testified that on June 15, 2000, she and the mother had taken the child to see Dr. Jo Anne Jackson, a pediatric dentist. The paternal grandmother stated that Dr. Jackson had recommended stainless-steel crowns for *209 the affected teeth, but that the mother had objected to the proposed treatment because Dr. Jackson would not allow a parent to accompany the child during the procedure and because the doctor planned on restraining the child during the treatment and using only a local anesthetic rather than general anesthesia. The paternal grandmother explained that because of these objections, the mother insisted upon seeking a second opinion.
The paternal grandmother testified that she had then made a series of appointments with Dr. Michael Anglin, another pediatric dentist, but that the mother had ultimately canceled those appointments, claiming that she had scheduling conflicts that had arisen on the appointed dates.
The record reveals that several days after the father filed the petition for custody, the mother sought dental treatment for the child at the dental school at the University of Alabama in Birmingham ("UAB"). The UAB records revealed that the student dentists planned to use the same restorative procedure using the same anesthetic Dr. Jackson had initially recommended. The mother listed Medicaid as the child's dental insurer. Dr. Robert De-Shazer, a family dentist, testified as an expert at the hearing. Dr. DeShazer had examined the child in preparation for his testimony and stated that restoration of the child's teeth would involve the placement of stainless-steel crowns on the affected teeth, with possible nerve treatments if the decay extended into the nerves. He further testified that if the decay extended to the point beyond which this approach was feasible, the affected teeth would require extraction and replacement by a partial denture to provide space into which the child's permanent teeth could grow.
The mother and the maternal grandmother testified on the mother's behalf.
The maternal grandmother admitted to being absent from the home a great deal for "personal" reasons, but stated that she believed that the mother was a "pretty good housekeeper" and a good mother. The maternal grandmother testified that the mother spent some time on the computer, but stated that she was unaware that the mother would take the child with her to parties and poker games where alcohol was served. The maternal grandmother further testified that she had never seen the mother consume an alcoholic beverage and that she had never seen the mother in an inebriated condition.
K.A., the mother's new husband, testified on her behalf. He testified that he and the mother had married on August 26, 2000, and that at the time of the hearing they were residing in Illinois. He testified that he had met the mother in mid-January 2000 when he had come to Alabama looking for a job. He explained that he was living in Illinois at the time, that he had custody of his nine-year-old son from his prior marriage, that his son's mother had been considering relocating to Florida, and that he had come to Alabama looking for a job so that his son could be closer to Florida. He testified that he had been offered a job in Alabama in July 2000 but that he had not accepted the offer because his employer in Illinois had offered him a promotion and a substantial salary increase to induce him not to leave his employ. The mother's husband also stated that he had included the minor child on his medical and dental insurance through his employer.
The mother testified that she did attend parties with the four peer witnesses who had testified against her; however, she stated that she had never drunk to excess at these parties and that she had kept the minor child with her when she was present at the parties and the poker games. She *210 explained that she had delayed obtaining dental care for the child because she had had problems finding a dentist with whom she felt comfortable in entrusting the child's care. The mother stated that she felt more comfortable with the dental students she had consulted at UAB than she had with the private pediatric dentist she had consulted on the advice of the paternal grandmother.
The record reflects that the only efforts undertaken by the guardian ad litem before the hearing had been a brief interview with the parties in his office. After testimony had concluded, the juvenile court invited the guardian to state his concerns concerning the child's welfare. The guardian expressed three concerns. The first concern was that the problem with the child's teeth had been noticed a year earlier and "[the parents] have yet ... to make substantial progress fixing their child's teeth." The guardian's second concern was that the testimony presented during the hearing concerning the supervision of the child when she was younger. The guardian's final concern was the relative lack of evidence presented concerning the mother's new husband and "household" in Illinois.
The juvenile court entered a judgment declaring B.K.W. to be the natural father of the child and declaring both B.K.W. and the natural mother unfit to serve as custodian for the minor child. The juvenile court awarded custody of the child to the paternal grandparents and awarded visitation to the natural parents. The juvenile court further directed each parent to pay child support in the amount of $140 per month to the paternal grandparents. The mother filed a postjudgment motion, which was denied by operation of law. Thereafter, she filed a notice of appeal to this court. The father has not appealed from the juvenile court's judgment. The juvenile court has certified the record as adequate in compliance with Rule 28(A)(1)(a), Ala. R. Juv. P.
Matters regarding child custody are within the trial court's discretion, and judgments pertaining to such matters will not be disturbed on appeal absent an abuse of discretion. Watson v. Watson, 634 So.2d 589 (Ala.Civ.App.1994). In addition, when evidence is presented ore tenus, as it was in this case, the trial court's judgment based on that evidence is presumed correct and will not be disturbed on appeal unless it is determined to be unsupported by the evidence so as to be plainly and palpably wrong. S.C.S. v. S.W.S., 707 So.2d 278 (Ala.Civ.App.1997).
Here, we are reviewing the propriety of a judgment awarding custody to a grandparent over a natural parent. Alabama law requires that a nonparent may overcome a natural parent's prima facie right to custody of his or her child only by adducing clear and convincing evidence that the parent has either voluntarily forfeited the right to custody or has neglected the child to a degree that renders the parent unfit to be entrusted with the child's care. Ex parte Terry, 494 So.2d 628, 632 (Ala.1986).
In its judgment, the juvenile court found:
"That both the natural father, B.K.W., and the natural mother, J.W., are unfit to have the care, custody and control of the minor child. The Court bases this finding on an opening statement made by the attorney for the natural father... wherein he stated that the natural father was in drug rehabilitation. Also, upon testimony taken ore tenus that the natural mother has neglected the minor child and has provided an unfit place for the minor child to live. The Court finds the testimony credible that she has left *211 dirty diapers on the floor, that her home is not being cleaned, that there are dishes and food left in the sink, that she on occasions went drinking with her friends and on several of those occasions took her minor child with her, that she spent an inordinate amount of time on the Internet leaving the minor child unattended, that she neglected the minor child's dental care, and that extensive dental work is now needed by the minor child."
On appeal the mother claims that the juvenile court's finding that she was unfit was unsupported by clear and convincing evidence. She points out that the evidence presented at the hearing pertained to the mother's care of the child as an infant, and contends that that evidence was not material to her current capacity to care for the child, who was three years old at the time of the hearing. We note that all of the evidence presented at the hearing was admitted without objection from the mother to preserve the issue of its materiality for appellate review. "Even in juvenile cases, proper and timely objections are required." M.W. v. State, 571 So.2d 361, 362 (Ala.Crim.App.1990). Further, not all of the testimony presented was limited to the earlier time period; the testimony concerning the condition of the child's teeth pertained to the child at the time of the hearing. In addition, one of the peer witnesses who testified against the mother stated that he had most recently seen the mother about two months before the hearing when she awakened him from sleep to ask him to testify in favor of her as the custodial parent. This witness further stated that he had visited in the mobile home she had occupied just before she moved to Illinois; he testified that although he had found the mobile home to be somewhat cleaner than the apartment the mother and the child had previously occupied, the kitchen of the mobile home had been dirty and insect-infested. He also stated that he had "partied" with the mother as recently as the summer preceding the October hearing. From a complete review of the evidence, we conclude that the juvenile court did not plainly and palpably err in determining that the mother was an unfit parent.
The mother also claims that she was unduly prejudiced by the juvenile court's allowing the paternal grandparents to intervene on the day of the hearing. She states that, because of her alleged lack of notice of the paternal grandparents' intervention, she was unable to conduct pertinent discovery pertaining to the paternal grandparents and was unable to properly prepare to defend a custody case against them. The mother states that she had expected to defend a custody battle against only the father, who was a known drug abuser. In support of her argument that the juvenile court denied her rights to due process by permitting the paternal grandparents to intervene on the date of the hearing, the mother cites Rule 24(A), Ala. R. Juv. P.
The mother's contention fails for several reasons. First, Rule 24(A) simply directs the juvenile court to ascertain, at the beginning of a hearing, whether "all necessary parties are present and ready to proceed"; it does not address the scope of any particular hearing. The mother was aware of the pending motion to intervene more than two weeks before the hearing and was sufficiently aware of the possibility that the motion would be granted to alert her to prepare her case against the paternal grandparents. Further, nothing in the record indicates that the mother contested the grandparents' motion to intervene. Moreover, the mother failed to challenge the juvenile court's ruling on the paternal grandparents' motion for intervention *212 and has therefore not preserved the issue of intervention for appellate review. See M.W., supra.
While the paternal grandparents' motion was styled as a "Petition to Intervene and Motion for Custody, Pendente Lite," the substance of the motion, rather than its style, is controlling. See Evans v. Waddell, 689 So.2d 23, 26 (Ala.1997). The motion states, in pertinent part:
"(13) That the [paternal grandparents] request the Court for permission to intervene as parties in the above case for the purposes of being considered for custody of the minor child.
"WHEREFORE, PREMISES CONSIDERED, [the paternal grandparents] move this Honorable Court to allow said [paternal grandparents] to intervene in the custody proceedings before this Court, award the care, custody, and control of the minor child to the [paternal grandparents] pendente lite, award the [paternal grandparents] custody of the minor child upon a final hearing in this case, and to award [the paternal grandparents] such other, further, and different relief to which they may be entitled."
(Emphasis added.) The wording of the motion itself advised the mother that the paternal grandparents were seeking custody of the minor child "upon a final hearing."
The trial court initially set the case for a final hearing on July 24, 2000. Thereafter, the trial court continued the trial several times by entering various notations on the case action summary sheet: "7/24/00 Cont. trial 8/7/00 9 A.M."; "8/7/00 Cont. for trial 9/25/00 9 A.M."; and "9/25/00 Continued for trial til 10/3/00 at 9 A.M. Pell City." Notice of the October 3 trial setting was provided to "Stevens [attorney for the minor child], Church [attorney for the father], Poole [attorney for the mother], Moore [attorney for the paternal grandparents], and father." Therefore, the mother was on notice that the "trial" setting on October 3, 2000, was for the purpose of conducting a final hearing.
Finally, the mother made no objection at trial to the court's consideration of the grandparents' petition for permanent custody of the child and the grandparents' presentation of evidence in support of that petition. She therefore acquiesced in the trial court's consideration of that petition and that evidence, and she cannot now be heard to complain of it on appeal. See, e.g., M.W., supra.
In light of the foregoing, the juvenile court's judgment is due to be affirmed.
AFFIRMED.
CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.
YATES, P.J., dissents.
YATES, Presiding Judge, dissenting.
I believe that the trial court abused its discretion in granting the grandparents' petition to intervene on the day of the hearing. I also believe that the trial court erred in granting permanent custody to the paternal grandparents when the only petition before the court by the grandparents was a petition for custody pendente lite.
On June 30, 2000, the father petitioned for custody of the child. Before the father filed his petition, the three-year-old child had been living with her mother. On September 15, 2000, the mother petitioned to establish paternity and child support. On September 21, 2000, the grandparents filed a motion "to intervene and motion for custody, pendente lite." On October 3, 2000, the day of the hearing, the trial court granted the paternal grandparents' motion to intervene. Before the day of trial, the *213 custody dispute was between the mother and the father, who was an admitted drug user. Although the trial court states in its order awarding the grandparents permanent custody that it granted the motion to intervene before the hearing in this matter, it is clear from the transcript that the motion was granted on the day of the hearing, giving the mother no time to prepare. At the hearing, counsel for the father stated that the father was participating in a drug-rehabilitation program. Counsel further stated that, as between the mother and the father, the father would be the most fit person. Counsel stated that as between the father, the mother, and the grandparents, the grandparents would be "most suited" to have custody of the child. Additionally, counsel stated that counsel would prefer the grandparents to have the child as opposed to the father. It appears from counsel's statements that the father, for all intent and purposes, was withdrawing his petition, although counsel stated that he was not withdrawing the petition, "I am just stipulating to the Court that if it stands between my client and the biological mother, we are better than she is." Tellingly, the father did not appear, nor did he call any witnesses. Following the hearing, the trial court found both the mother and father unfit, and awarded permanent custody to the grandparents. Both the mother and the father were awarded unsupervised visitation with the child.
It appears that counsel for the mother and the grandparents believed that the hearing was a pendente lite hearing and not a hearing for permanent custody. The grandparents' motion indicates that they were seeking pendente lite custody and subsequently to be awarded "custody of the minor child upon a final hearing in the cause." At the hearing, counsel for the grandparents stated:
"[The grandparents] are not out here seeking the added burden in their life to raise a child. This child at this point in its life needs that lady over there [the grandmother]. Maybe not forever, but for right now. Get these teeth fixed. If this young lady demonstrated that she is caring and capable to take care of this child, let her have the child. But for right now, the child needs to be here and get the care the child (INAUDIBLE)."
The mother argued in her motion to alter, amend, or vacate the judgment, that the trial court erred in awarding permanent custody to the grandparents, because the only petition before the court at the hearing was the grandparents' motion for custody pendente lite. The mother's motion stated:
"That on October 3, 2000, this Court, by granting custody to the paternal grandparents, clearly denied due process to your Petitioner herein. Further, at the time this Court granted custody to the paternal grandparents, the only pleading pending was their Petition for Custody Pendente Lite. There was no petition for the paternal grandparents to take full custody of the minor child[;] consequently, your Petitioner herein, at the time of the Pendente Lite hearing, had not completed the discovery necessary to adequately defend a claim for full custody. Further, your Petitioner herein had no notice that the paternal grandparents were requesting full custody of the minor child or that the October 3, 2000 hearing was anything other than a temporary hearing."
To satisfy the essential requisite of procedural due process, parties must be given timely notice of a hearing, and that notice must adequately inform the parties of the specific issues they must prepare to meet. Ex parte Shuttleworth, 410 So.2d 896, 899 *214 (Ala.1981). "Failure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy." In re Gault, 387 U.S. 1, 19-20, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
Pendente lite orders awarding custody to a nonparent do not defeat the mother's presumptive superior right to custody of a child over that of the nonparent. Ex parte R.C.L., 627 So.2d 920 (Ala.1993). Consequently, the ramifications of litigating a petition seeking pendente lite custody as opposed to one seeking permanent custody are substantial. I note that this was an initial custody determination and that the father had not yet been adjudicated to be the father of the child. It appears that both counsel for the mother and counsel for the grandparents believed that the hearing was a pendente lite hearingnot a hearing at which permanent custody must be determined. Although I recognize that the mother did not object when the grandparents were included as intervenors on the day of the hearing, this, I think, was because of her belief that the hearing was set only for pendente lite custody. Therefore, I believe that the mother was not afforded due process when the trial court failed to give her prior notice that it was considering the grandparents as permanent custodians for the child. She was denied the opportunity to present evidence challenging the suitability of a nonparent when the trial court entered a permanent order of custody after the father essentially withdrew his petition for custody in open court and the grandparents had petitioned only for custody pendente lite.
NOTES
[1] Those witnesses were all approximately 22 years old at the time of the hearing.